CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
NOV 30 2010
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| PAUL T. NOLAN, Administrator of the Estate of Kiernan Edward Nolan, Deceased, | ) ) ) |
| Plaintiff, | ) ) Civil Action No. 5:09CV00039 |
| v. | ) ) **MEMORANDUM OPINION** ) |
| DEBBIE C. GRIM, Administrator of the Estate of Ricky Franklin Brill, | ) By: Hon. Glen E. Conrad ) Chief United States District Judge ) |
| Defendant. | ) ) |

This case arises from a series of events that culminated in the fatal shooting of Kiernan Nolan by Frederick County Deputy Sheriff Ricky Brill. Paul T. Nolan, administrator of the estate of Kiernan Nolan, filed this civil action under 42 U.S.C. § 1983, alleging that Deputy Brill used excessive force in violation of the Fourth Amendment. The plaintiff also asserted a supplemental state law claim of wrongful death. After the action was filed, Deputy Brill died in a motor vehicle accident, and Debbie Grim, the administrator of Brill's estate, was substituted as defendant. The case is presently before the court on the defendant's motion for summary judgment. For the reasons that follow, the court concludes that genuine issues of material fact preclude the entry of summary judgment on both of the plaintiff's claims. Accordingly, the defendant's motion will be denied.

### Statement of the Facts

The following facts are presented in the light most favorable to the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (noting that all evidence must be construed in the light most favorable to the party opposing summary judgment).

Kiernan Nolan ("Nolan") suffered from bipolar disorder, schizophrenia, and seizure disorders. On the morning of June 4, 2007, Nolan was especially agitated. Around 6:00 a.m., Nolan's girlfriend, Christina Duvall,[1] called his sister-in-law, Tracey Nolan, and advised her that Nolan had been having seizures, that he was "talking out of his head," and that he was walking down the road wearing only his pajama bottoms. (Duvall Dep. at 23.) Tracey Nolan subsequently retrieved Nolan and returned him to his house.

Tracey Nolan and Christina Duvall both believed that Kiernan Nolan needed to go to the hospital. After conferring with her husband, plaintiff Paul Nolan, Kiernan Nolan's brother, Tracey Nolan called the Frederick County Sheriff's Department for assistance. Nolan knew at least one of the deputies who responded to the call and ultimately agreed to go to the hospital.

Nolan was admitted into the emergency department of Winchester Medical Center at 6:56 a.m. on June 4, 2007. Based on Nolan's medical history and the fact that he was complaining of hearing voices, the nurse in the triage unit determined that Nolan needed to be seen on the acute side of the hospital. When the nurse stepped out of the triage unit for a brief moment, Nolan abruptly exited the unit. Although the nurse chased after Nolan, the nurse was unable to stop him from leaving the hospital.

The nurse alerted hospital security and told them to call the police department. Deputy Rick Brill and other law enforcement officers were advised of the circumstances by radio and were instructed to be on the lookout for Kiernan Nolan.

---

[1] Christina Duvall has since married, and her last name is now Moses. For clarity, the court will refer to her as Christina Duvall.

Kiernan Nolan next showed up at his brother's job site around 9:30 a.m., after being dropped off by someone who had found him walking down the road.[2] Paul Nolan thought that his brother needed to be taken back to the hospital, and called his wife for assistance. Tracey Nolan subsequently called Christina Duvall and asked her to pick up Nolan.

When Duvall arrived at the job site, Nolan "was too incoherent to even know he had been in the hospital." (Duvall Dep. at 28.) Although Paul Nolan asked Duvall to take Kiernan Nolan back to the hospital, Duvall instead returned him to their residence at 217 Falcon Trail. She then left him home alone while she went to a medical appointment.

Shortly thereafter, Tracey Nolan took her own children, one of Duvall's children, and Kiernan Nolan's children to a restaurant for lunch. While at the restaurant, one of Tracey Nolan's friends called to advise her that Kiernan Nolan was throwing televisions off his deck and yelling.

Tracey Nolan gathered the children in her truck, called the Sheriff's Department, and advised the dispatcher that she was going to need assistance transporting Kiernan Nolan back to the hospital. As one dispatcher was taking the call from Tracey Nolan, another dispatcher, Pam Baber, relayed the information to local law enforcement units. It was reported out to Deputy Brill and other officers that Kiernan Nolan was throwing items out in the front yard at 217 Falcon Trail, that he had been transported to the medical center earlier in the morning for mental issues, and that he had walked away from the medical center.

When Tracey Nolan and the children arrived at 217 Falcon Trail, Tracey Nolan saw the televisions on the ground. Kiernan Nolan approached her and advised her not to look into the

---

[2] Kiernan Nolan worked for his brother as a bricklayer.

televisions because they would "hurt" her. (T. Nolan Dep. at 88.) He then took his thumbs and pressed them into Tracey Nolan's eyes, again emphasizing that he did not want her to look into the televisions. (T. Nolan Dep. at 86-88.) Tracey Nolan proceeded to call Christina Duvall and "asked her where she was because [Kiernan Nolan] was freaking out." (T. Nolan Dep. at 89, 95.)

When Duvall arrived at the house, she saw the televisions "busted in the driveway." (Duvall Dep. at 29.) Kiernan Nolan approached Duvall, pressed his thumbs against her eyes, and told her not to look into the televisions. Duvall also saw that several of the couple's kittens were dead, and Kiernan Nolan admitted to having killed them.

While Tracey Nolan, Duvall, and all of the children were still at 217 Falcon Trail, Tracey Nolan called the Sheriff's Department again for assistance:

| | |
|---|---|
| Dispatcher: | Frederick County (inaudible) This is Amy. |
| T. Nolan: | Yes, Amy. This is Tracey Nolan, I need someone here now at 217 Falcon Trail. He's done killed the cats, he's killed the dog. |
| Dispatcher: | He just did that now? |
| T. Nolan: | Well, we just got – I just got here. He's got TV's broken. Killed the animals with his bare hands. And the dog – |
| Dispatcher: | Okay, ma'am, calm down for me okay? |
| T. Nolan: | Yeah, I'm calm. I work in the psych ward so I'll put him in a man hold if I have to – |
| Dispatcher: | Okay. Well, don't put yourself in danger. |
| T. Nolan: | I won't. Tina, get the truck and the kids out of here. He's already killed the cat and dog. Pardon me? |
| Dispatcher: | I'm just trying to get the other dispatcher ma'am, I'm sorry. |
| T. Nolan: | I'm getting the kids outta here. |

4

> Dispatcher: Yeah. Remove everybody.
>
> T. Nolan: Get the kids out of here.

(T. Nolan Dep. at 241-242.)

Dispatcher Baber reported out to Deputy Brill and the other officers while her counterpart was receiving information from Tracey Nolan. Baber advised the officers that Kiernan Nolan had apparently "killed the cat and dog in the residence with his hands." (Baber Decl. para. 4.) Almost immediately after that dispatch, Dispatcher Baber reported out to Deputy Brill and the other officers that "there are children and other adults in the residence. They're trying to get everybody out of the house and away from the subject. (Baber Decl. para. 5.)

That was the last dispatch that Deputy Brill and other officers received before Brill arrived at 217 Falcon Trail in response to the calls for assistance. Before any of the officers arrived, Christina Duvall left the residence in Tracey Nolan's truck with all of children. However, this information was not provided to dispatch and, thus, not reported to the officers en route to the residence.

Deputy Brill was the first law enforcement officer to arrive on the scene. After Deputy Brill arrived, Kiernan Nolan walked out of the house and crossed his arms in front of him at his wrists. When Deputy Brill approached Kiernan Nolan and grabbed his wrists, Nolan "pulled back and freaked out." (T. Nolan Dep. at 103.) He then proceeded to press his thumbs into the deputy's eyes, as he had done to Tracey Nolan and Duvall.

At that point, Deputy Brill told Nolan to "get down, get down," and sprayed him with pepper spray. (T. Nolan Dep. at 113.) Nolan then exited the porch and ran toward the tree line.

Although Deputy Brill continued to tell Nolan to stop and get down on the ground, Nolan would not do so and the pepper spray did not stop him.

After reaching the edge of the woods to the right of the house, Kiernan Nolan ran toward the driveway. Deputy Brill continued directing Nolan to get down on the ground, but Nolan failed to comply with the deputy's commands. Deputy Brill then pulled out his ASP baton and ran along side Nolan, hitting him five or six times on the back of his right calf.

Nolan eventually got down on the ground in front of his truck. Deputy Brill then squatted down next to Nolan and told him to lay on the ground. When Deputy Brill placed his left knee between Nolan's shoulder blades so that he could place Nolan in handcuffs, Nolan "pop[ped] up out from under his knee" and ran up the deck steps to the front door of the house. (T. Nolan Dep. at 149.)

Deputy Brill ran after Nolan and commanded that he get on the ground. The deputy then drew his service weapon, pointed it at Nolan, and tried to keep Nolan from entering the house. Deputy Brill testified at his deposition that he did not know if the house was occupied or contained weapons, "[s]o he was trying to get [Nolan] to stop before [Nolan] made entry into the house." (Brill Dep. at 74.) According to Tracey Nolan, Deputy Brill never asked her if there were children or other adults inside the home.

Kiernan Nolan ultimately entered the house and tried to shut the door, but Deputy Brill "put his right foot in the door and . . . made his way" inside. (T. Nolan Dep. at 151.) Although Brill was initially able to pin Nolan against the wall, Nolan broke free and ran into a small bedroom.

What happened next is in dispute and forms the crux of this case. The record contains only Deputy Brill's account of his confrontation with Kiernan Nolan inside the bedroom, since Nolan died at the scene. Although Tracey Nolan was also at the house, she remained outside when Deputy Brill followed Kiernan Nolan into the bedroom.

According to Deputy Brill's deposition, the deputy found Nolan jumping on the bed in the bedroom, "throwing punches, karate kicks, [and] screaming." (Brill Dep. at 82.) After Nolan kicked the deputy a few times, Nolan eventually laid face down on the bed. When Deputy Brill got within arm's reach of him, Nolan rolled off the bed and began to punch and kick the deputy. At that point, Deputy Brill withdrew his ASP baton. When Nolan continued to strike at Brill, the deputy tried to hit Nolan with the baton. After missing Nolan and instead striking the wall, Deputy Brill struck Nolan in the arm. When Brill attempted to strike Nolan in the arm again, Nolan ducked and the baton hit his head instead.

Deputy Brill testified that Nolan became enraged after being struck in the head. He proceeded to tackle Deputy Brill, who weighed approximately 100 pounds more than Nolan, causing the deputy to lose control of the ASP baton. The two men allegedly landed in a small space between the bed and the east wall, at which point Deputy Brill was "flat on the floor" and Nolan was on top of him. (Brill Dep. at 92.)

While Deputy Brill was trying to push Nolan off of him, Nolan unsuccessfully attempted to get the deputy's service weapon. Nolan then broke away, jumped up, and retrieved the deputy's ASP baton from the floor. Deputy Brill testified that Nolan raised the baton over his head and started coming toward Brill, while Brill was still on the floor between the bed and the wall. Deputy Brill drew his service weapon and ordered Nolan to stop and drop the baton.

7

When Nolan failed to comply with Deputy Brill's orders, Brill shot Nolan on the left side of his chest. Brill testified that the shot had very little effect on Nolan, and that Brill ordered Nolan to drop the baton again. Nolan then proceeded to "turn[] a little bit, and then . . . turned toward [Brill]." (Brill Dep. at 99.) At that point, Brill fired a second shot, two to three seconds after the first, that ultimately struck Nolan on the left side of his back. Brill testified that "at the time that [he] went to fire a second round, [Nolan] made a motion to turn toward the door." (Brill Dep. at 99.) Brill also testified that when the first shot was fired, Nolan was "right over him," and that when the second shot was fired, Nolan was "no more than 5 feet from him." (Brill Dep. at 101.) After the second shot was fired, Nolan "dropped the baton, ran toward the door, and said, 'You f__king killed me,' at which time he turned and looked toward [Brill] and fell in the doorway" to the bedroom. (Brill Dep. at 101-102.)

Tracey Nolan entered the house after the second shot was fired. She found Kiernan Nolan face down in the doorway to the bedroom with his head toward the exit. Tracey Nolan testified that "probably only minutes" elapsed from the time that Deputy Brill responded to the residence until the shots were fired. (T. Nolan Dep. at 170.)

The autopsy report lists the cause of death as "gunshot wound to chest and back." (Pl.'s Ex. D.) The report describes the gunshot wound to the chest as an "intermediate range" wound with "powder tatooing." (Pl.'s Ex. D.) The gunshot wound to the back is described as a "distant range" wound. (Pl.'s Ex. D.) According to the plaintiff's expert, Richard T. Callery, M.D., both wounds were potentially fatal.

## Procedural History

On June 1, 2009, the plaintiff filed the instant action against Deputy Brill, asserting claims of excessive force and wrongful death. Approximately six months later, Deputy Brill died as the result of a motor vehicle accident. By order entered March 2, 2010, Debbie C. Grim, the administrator of Brill's estate, was substituted as defendant.

Grim subsequently filed a motion for summary judgment. The court held a hearing on the motion on November 19, 2010. The motion is fully briefed and ripe for review.

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

### I. Excessive Force Claim Under Section 1983

The plaintiff filed suit under 42 U.S.C. § 1983, which imposes civil liability for constitutional violations committed under color of state law. The plaintiff alleged that Deputy Brill's use of force, particularly his use of deadly force, violated Kiernan Nolan's rights under the

Fourth Amendment to the United States Constitution.[3] In moving for summary judgment with respect to this claim, the defendant argues that the claim fails on the merits and, alternatively, that Deputy Brill is entitled to qualified immunity. The court will address each of these arguments in turn.

### A. The Merits of the Excessive Force Claim

"It is clearly established that citizens have a Fourth Amendment right to be free from unreasonable seizures accomplished by excessive force." Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009). In assessing claims of excessive force under the Fourth Amendment, the court must apply a standard of "objective reasonableness." Graham v. Connor, 490 U.S. 386, 395 (1989). Specifically, the court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Graham, 490 U.S. at 396-397). "Recognizing that 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving' – [the court must] consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the '20/20 vision of hindsight.'" Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002) (quoting Graham, 490 U.S. at 396, 397).

When deadly force is utilized by a law enforcement officer, "the Supreme Court has long recognized that the intrusion on Fourth Amendment rights is 'unmatched.'" Clem, 284 F.3d at

---

[3] The plaintiff's second amended complaint also asserted separate claims of excessive force related to Deputy Brill's use of his hands and knees; the deputy's use of pepper spray; and the deputy's use of the ASP baton. However, the plaintiff confirmed during the hearing on the defendant's motion for summary judgment that he is pursuing a single Fourth Amendment claim arising from the use of deadly force.

10

550 (quoting Tennessee v. Garner, 471 U.S. 1, 9 (1985)). Consequently, such force is reasonable only when the "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 11. Additionally, under Graham, the court must focus on the moment deadly force was used. Elliott, 99 F.3d at 644. Actions prior to that moment are not relevant in determining whether the use of deadly force was reasonable. Id.

In this case, the uncontroverted evidence establishes that Deputy Brill shot Kiernan Nolan twice and that Nolan died as a result of the gunshot wounds. The court must therefore determine whether it is clear from the evidence that Brill's conduct was motivated by a reasonable belief that Nolan posed a serious and immediate threat to Brill's life and safety, as the defendant maintains, or if a reasonable jury could find that Nolan was not posing an imminent threat to Brill at the time Nolan was shot.

Because Nolan and Deputy Brill were the only individuals inside the house when Nolan was killed, the plaintiff has no way to directly contradict the deputy's testimony as to what transpired in the bedroom. In such circumstances, "the court may not simply accept what may be a self-serving account by the police officer." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). Instead, the court must also consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." Id. As the United States Court of Appeals for the Fourth Circuit noted in Ingle v. Yelton, 439 F.3d 191 (4th Cir. 2006), "several courts have vacated the entry of summary judgment when the physical evidence undermined the officers' assertions that they feared for their safety before deploying lethal force, even when there was no

other witness to the shooting." Ingle, 439 F.3d at 196 (citing cases from other circuits and holding that the district court erred in refusing to permit the plaintiff to engage in additional discovery before ruling on the defendants' summary judgment motion); see also Maravilla v. United States, 60 F.3d 1230, 1233-1234 (7th Cir. 1995) (emphasizing that where "the witness most likely to contradict the officers' testimony is dead," the court should "examine all the evidence to determine whether the officers' story is consistent with other known facts"); Plakas v. Drinski, 19 F.3d 1143, 1147 (7th Cir. 1994) ("The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify"; "a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial.").

As previously summarized, Deputy Brill testified that after he struck Nolan in the head with the ASP baton, Nolan wrestled him flat to the floor in the small space between the bed and the wall, and gained possession of the baton. The deputy further testified that because Nolan was standing over him and prepared to strike him with the baton, he had no choice but to shoot Nolan in order to save himself. Deputy Brill also testified that he was forced to fire a second shot two to three seconds later, because Nolan failed to drop the baton after being struck with the first bullet. Additionally, Deputy Brill testified that Nolan was no more than five feet away from him at the time of the second shot, and that Nolan turned as the second shot was fired.

The defendant has proffered expert opinions that support Deputy Brill's account of the incident. For instance, Jack Daniel, M.D., former Assistant Chief Medical Examiner for the Commonwealth of Virginia, opined that Kiernan Nolan's wound characteristics were "consistent

with Mr. Nolan having sustained both gunshot wounds over a very short interval of time while Nolan was in an elevated position relative to Deputy Brill's ground level location." (Daniel Report at 1.) Dr. Daniel also opined that both gunshot wounds were consistent "with having occurred during the course of aggressive advances by Nolan upon Brill" and "with having been sustained immediately preceding . . . and immediately following . . . some clockwise turning of Nolan's torso." (Daniel Report at 1.) Additionally, William Conrad, a forensic scientist who field tested Deputy Brill's service weapon, opined that the results of the testing were consistent with the description of the shooting incident provided by Deputy Brill. Conrad determined that the fact that gunshot residue was present at the first bullet wound to Kiernan Nolan's chest, but not at the second wound to his back, did not necessarily indicate any significant difference in the distance from which the two shots were fired.

If Deputy Brill's account of the incident was not in dispute, his argument as to the reasonableness of his actions would be well-taken. However, Deputy Brill's testimony is disputed by the plaintiff, who maintains that Nolan never gained possession of the deputy's ASP baton and that Nolan was attempting to retreat from the bedroom when he was shot by Brill. For the following reasons, the court concludes that the plaintiff has presented evidence from which a rational jury could discredit Deputy Brill's account of what transpired in the bedroom, and find that the deputy's use of deadly force was not objectively reasonable.

First, there is no forensic evidence linking Kiernan Nolan to the ASP baton that he was allegedly wielding at the time he was shot. The baton was submitted for fingerprint testing, but no latent fingerprints were found on the baton. Although the defendant argues that the lack of fingerprints is not surprising since it is a foam-handled device, the entire baton is obviously not

13

constructed of foam, and the defendant has failed to provide any explanation for the lack of fingerprints on the rest of the device. The court agrees with the plaintiff that a reasonable jury could find that the lack of forensic evidence linking Nolan to the baton tends to discredit Brill's assertion that Nolan was wielding the baton at the time he was shot. See, e.g., Estate of Bing v. City of Whitehall, 456 F.3d 555, 571 (6th Cir. 2006) (emphasizing, in affirming the denial of summary judgment on a deadly force claim, that the gun the decedent allegedly fired at the officers did not bear the decedent's fingerprints).

In addition, Deputy Brill's handling of the ASP baton following the shooting was arguably inconsistent with the deputy's story. Deputy Brill maintained possession of the baton after Kiernan Nolan was shot and did not turn the baton into evidence until 5:30 p.m. on the day of the incident, over three and a half hours after the shooting occurred. As the plaintiff emphasizes in his brief in opposition to summary judgment, a rational jury could find "that an officer trained to preserve evidence would not have disturbed an ASP baton which justified his use of deadly force." (Pl.'s Br. in Opp. at 12.) Thus, the fact that the baton was removed from the scene by Deputy Brill provides an additional basis upon which a jury could discredit the deputy's account of the incident.

Along the same lines, the record contains a photograph of the bedroom, taken on the day of the incident, that fails to corroborate the deputy's claim that he was pinned between the bed and the wall at the time he shot Kiernan Nolan. In the photograph, a sizeable, undamaged cardboard box is located in the small space between the bed and the wall, in the same spot that Nolan allegedly wrestled Deputy Brill flat to the floor. In an attempt to lessen the significance of the photograph, the defendant emphasizes that Special Agent Eric Deel, who photographed the

14

room, testified at his deposition that certain items had been moved before the photograph was taken. In response to further questioning, however, Deel confirmed that the cardboard box shown in the photograph was located in essentially the same spot as it was originally found. As the plaintiff emphasizes, the defendant has failed to explain how Deputy Brill, who weighed 245 pounds, could land flat on his back between the bed and the wall, without causing any apparent damage to the box.

The court further concludes that "the difference in size between [Kiernan Nolan and Deputy Brill] raises an issue of fact." Samples v. City of Atlanta, 846 F.2d 1328, 1332 (11th Cir. 1988). At the time of the shooting, Brill was six feet, two inches tall and weighed 245 pounds, whereas Nolan was five feet, eight and a half inches tall and weighed only 140 pounds. Although the defendant suggests that such evidence is irrelevant, the court agrees with the plaintiff, that, given the unique context of this case, the physical disparity between the two men "raises an inference that the situation was not life-threatening and that, therefore [Deputy Brill] was excessively violent in killing [Kiernan Nolan]." Id.; see also Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 174 (6th Cir. 2004) (noting, inter alia, the disparity in size between the plaintiff and the officers in affirming the denial of qualified immunity on the plaintiff's excessive force claim); Jordan v. Blackwell, 2008 U.S. Dist. LEXIS 75046, at *15 (M.D. Ga. Sept. 29, 2008) (finding that the disparity in size between an officer and an arrestee was one factor that raised a jury question as to whether the degree of force utilized by the officer was reasonable).

Finally, and perhaps most importantly, Nolan was shot in the back by the second bullet, when he was farther away from Deputy Brill, which "raises a serious issue of fact." Samples,

846 F.2d at 1332. While Brill claims that Nolan turned his body just as the second bullet struck him, "it is also possible that after [Nolan] turned to run away, [Deputy Brill] continued shooting." Id. Because the location of the second bullet wound is consistent with the plaintiff's theory that Nolan was attempting to flee from Deputy Brill at the time of the shooting and, thus, posed no threat to the deputy's safety, such evidence could convince a jury to discredit the deputy's testimony and find that his actions were not objectively reasonable. Id.; see also Lewis v. Boucher, 35 F. App'x 64, 67 (4th Cir. 2002) (affirming the district court's denial of qualified immunity in an excessive force case, where the district court concluded that "the factual determination of whether Boucher shot Lewis in the front or in the back [was] indispensable in deciding whether a reasonable officer could have believed that the use of force against Lewis was objectively reasonable") (internal quotation marks omitted); Estate of Bing v. City of Whitehall, 456 F.3d at 571 (holding that the district court properly denied summary judgment in favor of officers with respect to the plaintiff's deadly force claim, where "the coroner's report and the autopsy report reflected that Bing had been shot in the back"); Estate of Fuentes v. Thomas, 107 F. Supp. 2d 1288, 1300 (D. Kan. 2000) ("The court cannot find that [the officer's] actions were objectively reasonable because the evidence, viewed in the light most favorable to the plaintiffs, is such that a rational fact-finder could infer that the defendant fired the third shot after the threat was abated.").

In sum, because Deputy Brill was the only surviving witness to the incident, and since the foregoing evidence proffered by the plaintiff is sufficient to place the deputy's account of the incident in dispute, the court is convinced that genuine issues of material fact preclude the entry of summary judgment, and that a jury must determine whether the deputy's actions were

objectively reasonable in light of the circumstances confronting him. Although a jury could resolve all factual disputes in favor of Deputy Brill and conclude that the use of deadly force was objectively reasonable, there is also evidence upon which a jury could discredit the deputy's testimony and find to the contrary. Given the factual disputes at hand, the court concludes that the defendant is not entitled to judgment as a matter of law on the plaintiff's Fourth Amendment claim.

### B. Qualified Immunity

The defendant alternatively argues that even if Deputy Brill used excessive force against Kiernan Nolan, the deputy is entitled to qualified immunity. The defense of qualified immunity "shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Henry v. Purnell, 501 F.3d 374, 376-377 (4th Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). When a government official asserts this defense, the court must determine: (1) "whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right"; and (2) "'whether the right was clearly established' -- that is, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. at 377 (quoting Saucier v. Katz, 533 U.S. 194, 201-202 (2001)). The answer to both of the foregoing questions must be in the affirmative in order for a plaintiff to withstand a motion for summary judgment on qualified immunity grounds. Henry, 501 F.3d at 377.

In the present case, the court has already determined that, taking the facts in the light most favorable to the plaintiff, a reasonable trier of fact could conclude that Deputy Brill's use of

17

deadly force was not objectively reasonable and, thus, violated Kiernan Nolan's Fourth Amendment rights. Consequently, the court must focus its attention to whether the constitutional right allegedly violated was clearly established at the time of the violation. In determining whether a right was clearly established, the key inquiry is "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.

At the time of the shooting in June of 2007, "the law was clearly established that claims of excessive force during arrest are governed by the Fourth Amendment and are analyzed under an 'objective reasonableness' standard." Smith v. Kendall, 369 F. App'x 437, 440 (4th Cir. 2010) (quoting Graham v. Connor, 490 U.S. at 388, 395-396). The law was also clearly established that an officer may use deadly force only "when he has a good reason to believe that the suspect presents a threat of serious physical harm to himself or others." Id. (citing Tennessee v. Garner, 471 U.S. at 11).

In the case at hand, the plaintiff has proffered evidence suggesting that Kiernan Nolan never possessed the ASP baton, and that Nolan was shot in the back as he was attempting to retreat from the bedroom. If this version of events is accepted, a reasonable officer in Brill's position could not have believed that he was acting lawfully in employing deadly force. As the Sixth Circuit has previously emphasized, "[n]o reasonable officer could fail to see that shooting an unarmed man in the back who had ceased to present a danger violates Garner." Estate of Bing v. City of Whitehall, 456 F.3d at 572.

In sum, because the events that transpired in the bedroom are genuinely disputed, and since these factual issues control the determination of whether a reasonable officer would have

18

known that the use of deadly force was excessive, the court is unable to conclude, at this stage of the proceedings, that Deputy Brill is entitled to qualified immunity. Accordingly, the court will deny the defendant's motion for summary judgment on the excessive force claim under § 1983.

## II. **Wrongful Death**

In addition to his claim of excessive force, the plaintiff asserted a supplemental state law claim of wrongful death. Since it is undisputed that Deputy Brill was engaged in a discretionary governmental function at the time of the shooting and, thus, entitled to sovereign immunity under state law, the plaintiff must establish gross negligence on the part of Deputy Brill in order to prevail on his wrongful death claim. See, e.g., Colby v. Boyden, 400 S.E.2d 184, 187 (Va. 1991); Estate of Harvey v. Roanoke City Sheriff's Office, 585 F. Supp. 2d 844, 863-864 (W.D. Va. 2008).

The Supreme Court of Virginia has "defined gross negligence as that degree of negligence which shows an utter disregard of prudence amounting to complete negligence of the safety of another." City of Lynchburg v. Brown, 613 S.E.2d 407, 410 (Va. 2005). In other words, gross negligence "is want of even scant care and amounts to the absence of slight diligence." Id. "Whether certain actions constitute gross negligence is generally a factual matter for resolution by the jury and becomes a question of law only when reasonable people cannot differ." Koffman v. Garnett, 574 S.E.2d 258, 260 (Va. 2003); see also Brown v. Mitchell, 327 F. Supp. 2d 615, 647 (E.D. Va. 2004).

In the instant case, for the reasons discussed above with respect to the excessive force claim, the court concludes that the record contains triable issues of fact regarding whether Deputy Brill acted with gross negligence in fatally shooting Kiernan Nolan. As previously stated, a

genuine factual dispute exists as to whether Nolan ever had possession of Deputy Brill's ASP baton, and as to whether Nolan posed a threat to Brill's safety when Brill shot him in the back. These issues of fact, if resolved against Deputy Brill, could lead a reasonable jury to conclude that Brill acted with gross negligence. Consequently, the factual issues relating to the plaintiff's wrongful death claim are not the sort that may be resolved by the court at this stage of the proceedings.[4]

## Conclusion

For the reasons stated, the defendant's motion for summary judgment will be denied, and the case will be proceed to trial. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 30th day of November, 2010.

/s/ Glen E. Conrad
Chief United States District Judge

---

[4] In moving for summary judgment on the plaintiff's wrongful death claim, the defendant argues, in a footnote, that Kiernan Nolan "was undisputably contributorily negligent in his dealings with Deputy Brill" and that Nolan's contributory negligence "thus bars his state law claim as well." (Def.'s Summ. J. Br. at page 48, note 146.) While recovery for gross negligence can be barred by proof of contributory negligence, see, e.g., Bane v. Mayes, 65 Va. Cir. 258, 259 (Va. Cir. Ct. 2004), the court agrees with the plaintiff that genuine issues of material fact preclude the application of the defense at this stage of the proceedings.